Minute Order Form (06/97)

# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | David H. Coar | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 02 C 3200 | **DATE** | 1/15/2003 |
| **CASE TITLE** | Blanch Billings vs. Continental Casual Company, a CNA Company | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

Plaintiff and Defendant's Cross Motions for Summary Judgment

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]
(2) ☐ Brief in support of motion due _____.
(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.
(4) ☐ Ruling/Hearing on _____ set for _____ at _____.
(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.
(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.
(7) ☐ Trial[set for/re-set for] on _____ at _____.
(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.
(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
    ☐ FRCP4(m)  ☐ Local Rule 41.1  ☐ FRCP41(a)(1)  ☐ FRCP41(a)(2).
(10) ■ [Other docket entry] For the reasons set forth in the attached Memorandum Opinion and Order, Billings' motion for summary judgment is GRANTED [5-1]. Billings is entitled to payment of disability benefits retroactive to January 7, 2002 with prejudgment interest at a rate of 9% pursuant to 215 ILCS 5/357.9. Further, Billings is entitled to the reinstatement of her long term disability benefits so long as she continues to meet the terms and conditions for continued receipt of such benefits. Accordingly, Continental Casualty Company's motion for summary judgment is DENIED [9-1]. All other motions are moot and terminated. This action is closed.

(11) ■ [For further detail see order attached to the original minute order.]

| | No notices required, advised in open court. | | | Document Number |
|---|---|---|---|---|
| | No notices required. | | number of notices | |
| | Notices mailed by judge's staff. | | JAN 21 2003 | |
| | Notified counsel by telephone. | | date docketed | |
| X | Docketing to mail notices. | | | |
| X | Mail AO 450 form. | | docketing deputy initials | |
| | Copy to judge/magistrate judge. | | | |
| | klb (lc) courtroom deputy's initials | Date/time received in central Clerk's Office | date mailed notice mailing deputy initials | |

# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| BLANCH BILLINGS, )<br>)<br>Plaintiff, )<br>)<br>v. )<br>)<br>CONTINENTAL CASUALTY COMPANY, )<br>a CNA Company, )<br>)<br>Defendant. ) | No. 02 C 3200<br><br>HONORABLE DAVID H. COAR<br><br>DOCKETED<br>JAN 2 1 2003 |

## MEMORANDUM OPINION AND ORDER

Plaintiff, Blanch Billings, filed an action in this Court alleging that defendant, Continental Casualty, wrongfully denied benefits to her under § 1132(a)(1)(B) of the Employee Retirement Income Security Act of 1974, 29 U.S.C. § 1001, et seq. (hereinafter "ERISA"). This Court has jurisdiction over the parties and the subject matter of this dispute in accordance with 29 U.S.C. § 1132(e)(1) and (f), as well as under 28 U.S.C. § 1331. Before this Court are cross motions for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure.

## I. Factual Background

The facts in this case are largely undisputed. Blanch Billing ("Billings") was, at all times relevant to this proceeding, a resident of Oak Lawn, Illinois. Billings was born on April 8, 1953. Billings was employed by DynCorp as Records Examiner/ Analyst from April 22, 1994 until May 21, 2001, at which time she ceased working and began receiving Short Term Disability benefits. Billing's monthly earnings in 2001 were approximately $3,144.25, 70% of which is $2,200.98. For and in consideration of premiums paid, DynCorp provided its employees,

including Billings, with disability income insurance coverage through an insurance policy (the "Plan") underwritten by Continental Casualty Company, a CNA Company ("CNA"), pursuant to Policy No. 83087049. At all times relevant hereto, CNA has maintained its principal place of business in Chicago, Illinois, located within the Northern District of Illinois.

At all times relevant hereto, the Plan constituted an "employee welfare benefit plan" as defined by 29 U.S.C. § 1002(1); and incident to her employment, Billings received coverage under the Plan as a "participant" as defined by 29 U.S.C. § 1002(7). The Plan was insured by CNA. Plan Benefits are payable for "Total Disability," meaning the following:

> During the Elimination Period [180 days] and the Insured Employee Occupation Period shown in Statement 4 of the Application [24 months], the Insured Employee, because of Injury or Sickness, is:
>
> (1) Continuously unable to perform the substantial and material duties of his regular occupation;
> (2) Under the regular care of a licensed physician other than himself; and
> (3) Not gainfully employed in any occupation for which he is or becomes qualified by education, training or experience.
>
> After the Month Benefits has been payable for the Insured Employee Occupation Period shown in Statement 4 of the Application, "Total Disability" means that, because of Injury or Sickness, the Insured Employee is:
>
> (1) Continuously unable to engage in any occupation for which he is or becomes qualified by education, training or experience; and
> (2) Under the regular care of a licensed physician other than himself.

Based on the benefit formula contained in the policy, Billings is eligible to receive benefits which represent 70% of her monthly wages, subject to coordination with payment of workers' compensation benefits and Social Security disability benefits, among others. The policy also provided for a 180 day waiting period (also known as elimination period) between the onset date of disability and the date benefits start.

The summary plan description ("SPD") provides "When making a benefits determination under the policy, We [CNA] have discretionary authority to determine Your eligibility for benefits and to interpret the terms and provisions of the policy." The SPD identifies DynCorp as the Plan Administrator. The policy states that "Benefits will be paid monthly immediately after [CNA] receive[s] due written proof of loss." Benefits are paid under the Plan until a claimant either no longer satisfies the definition of "Total Disability" or "[t]o the Insured Employee's 65th birthday" (so long as the claimant is 61 or younger at the time of onset of disability).

DynCorp additionally sponsored a short term disability policy for its employees which was also insured by CNA. Billings first began seeing Sandeep Amin, M.D. ("Dr. Amin") at the Rush Pain Center on June 22, 1999 for treatment of lower back pain and right leg pain. Dr. Amin stated that her pain originated from spinal stenosis secondary to degenerative changes in her lumbar spine, most notably at the levels of L3-L4 and L4-L5. Since Billings was seen in 1999, she received 2 lumbar epidural steroid injections and had good relief of her pain. She continued to follow up in the Clinic for continuance of her care for the same problem. Billings ceased working as a Records Examiner/ Analyst at DynCorp after January 19, 2001, as advised by her treating doctor, Richard N. Rovner, M.D. ("Dr. Rovner"). Dr. Rovner completed an Attending Physician's Statement in support of Billings' short term disability application. Billings continued to receive treatment at the Rush Pain Center for lower back pain and pain in right lower extremities, including her buttock and thigh. An MRI revealed disc bulges at L3-L4 and L4-L5 vertebrae, with degenerative disc disease and stenosis. Dr. Rovner listed her diagnosis as "Spinal stenosis with right lower extremity lumbar radiculopathy. " In addition to a prescription for Vicodin, Billings underwent a series of 2 lumbar epidural steroid injections. On

-3-

March 28, 2001, CNA's nurse case manager assigned to Billings' short term disability claim, Eileen Taylor ("NCM" or "Taylor"), stated the "[r]esults of MRI and series of injection [are] supportive of inability to do duties of job that requires extended periods of sitting." CNA approved her initial short term disability claim commencing January 20, 2001 and paid benefits through March 18, 2001, when she returned to work with no restrictions. Billings was to return to work part time while receiving a third series of epidural steroid injections to relieve her pain. Billings eventually returned to work full time with no restrictions; and CNA closed her short term disability claim file.

Plaintiff filed another disability claim on June 14, 2001 indicating that her last day worked was May 21, 2001. Plaintiff told CNA that her pain and difficulty with ambulation got progressively worse. Drs. Djordjevic and Rovner referred Billings to Leonard J. Cerullo, M.D. ("Dr. Cerullo), a neurosurgeon, in May 2001. Plaintiff reported to Dr. Cerullo that she underwent epidural steroid injections a few months prior and that the first was temporarily helpful in affording relief but the second and third were not. In addition to her lower back pain, Billings reported to Dr. Cerullo that she suffers from right hip pain which extended to her knee, and tingling through to her foot. She began noticing similar symptoms in her left leg. Billings also reported suffering right-sided numbness and weakness. Dr. Cerullo explicitly concurred with the diagnoses resulting from the January 2001 MRI. A neurological examination conducted by Dr. Cerullo additionally revealed a marked degree of lumbar spasm with lateral shift. Dr. Cerullo also noted Billings has a limited range of motion in her back. He could not perform straight leg raise testing due to Billings' pain. Dr. Cerullo referred Billings for physical therapy at Occu-Sport Physical Therapy. During her initial visit with Maureen O'Keefe, MPT

("O'Keefe") on June 13, 2001, Billings reported that she was in constant pain that worsened with standing, walking and sitting for long periods. Specifically, Billings described burning and deep dull pain in her left buttock and left posterior thigh; deep and sharp pain, and dull ache in her right buttock and right anterior thigh; extreme tingling in her right anterior shin; and very mild lower back pain. O'Keefe's report stated that Billings was assessed as having a chronic case of lumbar radiculopathy due to related stenosis in the lower back. It went on that state that Billings has significant limitations in her function as a result of the lower extremity pains and that she has poor awareness of lumbar position and is unable to control her lordosis through active means. O'Keefe opined that Billings would benefit from physical therapy to reduce tightness in the lower extremities, improve spinal stabilization ability and to improve body mechanics with activities of daily living. O'Keefe recommended that Billings undergo physical therapy three times per week for eight weeks to include neuromuscular re-ed, spinal stab exercises, with biomechanics instruction, strengthening exercises, stretches, IFC, ice, soft tissue mob, US and additional MOD only as warranted. Dr. Cerullo also prescribed a series bilateral facet lumbar steroid injections at L2-3, L3-4 and L4-5, which Billings underwent on July 12 and July 26, 2001.

On July 2, 2001, CNA's NCM reviewed the June 13, 2001 physical therapy findings and treatment plan, and Dr. Cerullo's prescription for facet injections. The NCM concluded, "Based on ongoing Tx through PT and facet injections, reasonable [claimant] would have difficulty doing even sedentary work for full time basis." On July 26, 2001, Dr. Amin performed medial branch blocks of the lumbar facets of L3 and L4, bilaterally, under fluoroscopy. The day of the procedure, Dr. Amin reported diagnoses of lumbar facet arthropathy and lumbar radiculopathy.

On July 30, 2001, the NCM conducted a phone interview with Billings. Billings reported to the NCM that she received limited relief from the steroid injections; she takes Vicodin for pain every other day; her pain level remains "7 out of 10" most of the time; she must change positions frequently because she can only tolerate continuous sitting for about 10 minutes and continuous standing for about 5 minutes; and she is most comfortable when lying down. On July 30, 2001, Nurse Taylor concluded that plaintiff's treatment with "facet injections for bursitis, supportive of inability to do duties of job requiring extended periods of sitting." CNA decided to continue benefits through August 2001.

CNA arranged to conduct surveillance on Billings. Investigative Options, Inc., conducted three days of surveillance on August 8, 9 and 14, 2001 at the behest of CNA. The cover page of the surveillance report states: "During this three-day surveillance, approximately one minute of videotape was obtained of Ms. Billings performing various physical activities such as walking, pushing, and bending. The claimant appeared to walk with a difference in stride, and did not utilize any visible medical brace or apparatus." The observations were made on August 14, 2001 as Billings left her home for a doctor's appointment.

On August 21, 2001, Taylor noted Billings was scheduled to undergo radio frequency denervation of both facet joints at L2-3, L3-4 and L4-5. Taylor indicated this procedure is "known as rhizotomy - the surgical resection of the dorsal root of a spinal nerve, performed to relieve pain." Taylor thus recommended continuing benefits, reporting that "[f]ailure of epidural injections and planned rhizotomy supportive of [claimant's] inability to do even sedentary work at least through date of procedure, 9/30/01." Accordingly both the NCM and DBS agreed to continue Billings' benefits through September 30, 2001. On September 20, 2001, Billings

-6-

underwent "radiofrequency denervation of the medial branches of the posterior primary rami with a number of facets, L2, L3, L4 and L5 bilaterally under fluoroscopy." Dr. Amin conducted the procedure and reported a diagnosis of lumbar facet arthropathy and lumbar radiculopathy. Dr. Amin explained that Billings had a longstanding history of low back pain with radiation through both the left and right lower extremities. Her further noted that Billings "had excellent relief with lumbar facet joint injections and medial branch blocks, but not long-acting."

The NCM contacted Billings by telephone on October 2, 2001. During that conversation, Billings stated that she was not doing very well and continued to have problems with pain. Billings reported that she found movement difficult and had particular problems walking. In a Progress Note from Rush Pain Center from October 16, 2001, Billings stated her pain was 50% improved since her treatment began. Over the previous 5 days she experienced pain rating 5 out of a possible 10 in her left leg and 10 out of 10 for her right leg. Dr. Amin prescribed Vioxx and Ultram and referred her to Dr. on for a surgical evaluation. Deirdre Chitty ("Chitty"), a disability specialist with CNA, spoke with Billings on October 17, 2001, as noted in the "Claims Analysis Record." Chitty reported that plaintiff was very angry and upset that CNA would not extend her benefits without additional medical information. Billings told Chitty she was only willing to supply her condition, her past treatment, future treatment, and her medications. Billings did not want her entire medical history viewed like an open book. Billings wanted to review information from her doctor before it was sent to CNA and refused to sign and return an authorization of information. Billings completed the statement of daily activities on October 22, 2001. Plaintiff stated that her condition affected her ability to care for her daily personal needs such as bathing, grooming, dressing, etc. She stated that the number of hours she sleeps each

night "varies" and that she is "in bed until it gets too painful." On November 9, 2001, after reviewing Dr. Amin's progress and procedure notes from July through October 2001, the NCM stated "[c]ontinuing radiculopathy and referral for surgical opinion supportive of [claimant's] continuing inability to do even sedentary work at least through results of surgical referral. CNA continued benefits through November 18, 2001 because the "medicals support [Billing's] disability." Benefits were further continued through December 4, 2001, pending Dr. On's surgical consultation.

On December 5, 2001, CNA informed Billings by letter that short term disability benefits had been approved for the maximum period payable of 26 weeks, or through November 19, 2001. CNA extended benefits through December 4, 2001 and stated the benefits will "continue into Long Term Disability." CNA further stated "[w]e will follow up with your 12-4-01 office visit with Dr. On for further benefits. Billings did not attend her scheduled visits with Dr. On and Dr. Djordjevic on December 4, 2001 because her mother passed away on December 3, 2001. She rescheduled her appointment with Dr. Djordjevic for January 3, 2002. On January 2, 2002, CNA informed Billings that no further benefits were payable until it received updated medical records from Dr. Djordjevic. On January 7, 2002, Dr. Djordjevic completed a Functional Assessment Tool form provided by CNA. The first question asked: "Do you feel your patient is currently capable of performing work at this time, which is primarily seated in nature but does allow the flexibility to stand and change positions when needed.." Dr. Djordjevic checked "No". Dr. Djordjevic went on to describe her specific limitations, stating that "she continues to have 1) ongoing low back pain and [right] thigh pain 2) cannot sit, stand, or walk for prolonged periods of time." The Claims Analysis record indicates CNA attempted to call Dr. Djordjevic and left a

message requesting a clarification of his response on the Functional Assessment Tool. In a letter dated January 15, 2002, CNA denied Billings long term disability benefits. The letter stated, "The medical information received from Dr. Djordjevic, dated January 7, 2002, states you are unable to work due to continued low back pain and right thigh pain. However, Dr. Djordjevic also states you cannot sit, stand, or walk for prolonged periods of time." CNA further stated "the medical information in your file does not indicate a physical impairment to function less than the requirements for your job beyond January 7, 2002." Billings appealed this decision in a letter to CNA on February 8, 2002. Billings also filed a consumer complaint against CNA with the Illinois Department of Insurance on January 31, 2002. CNA upheld its denial of long term disability benefits in a letter dated March 27, 2002. CNA noted that plaintiff's job is sedentary and allows her to move about as necessary. CNA also stated that it "appears based on the information presented that your greatest difficulty that is posed by your condition is getting to and from work." Having exhausted the administrative appeals process, Billings filed this suit on May 3, 2002.

## II. Summary Judgment Standard

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); Michael v. St. Joseph County, et. al, 259 F.3d 842, 845 (7th Cir. 2001). A genuine issue of material fact exists for trial when, in viewing the record and all reasonable inferences drawn from it in a light most favorable to the non-movant, a reasonable jury could return a verdict for the non-movant. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S. Ct. 2505,

2510, 91 L. Ed. 2d 202 (1986); Hedberg v. Indiana Bell Tel. Co., 47 F.3d 928, 931 (7th Cir. 1995).

Because the purpose of summary judgment is to isolate and dispose of factually unsupported claims, the non-movant must respond to the motion with evidence setting forth specific facts showing that there is a genuine issue for trial. See Fed. R. Civ. P. 56(e); Michael, 259 F.3d at 845; Albiero v. City of Kankakee, 246 F.3d 927, 932 (7th Cir. 2001). To successfully oppose the motion for summary judgment, the non-movant must do more than raise a "metaphysical doubt" as to the material facts, see Wolf v. Northwest Ind. Symphony Soc'y, 250 F.3d 1136, 1141 (7th Cir. 2001) (citation and quotation omitted), and instead must present definite, competent evidence to rebut the motion, see Albiero, 246 F.3d at 932. Rule 56(c) mandates the entry of summary judgment against a party "who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and in which that party will bear the burden of proof at trial." Celotex, 477 U.S. at 322, 106 S. Ct. at 2552-53. A scintilla of evidence in support of the non-movant's position is not sufficient to oppose successfully a summary judgment motion; "there must be evidence on which the jury could reasonably find for the [non-movant]." Anderson, 477 U.S. at 250, 106 S. Ct. at 2511.

On cross-motions for summary judgment, each movant must individually satisfy the requirements of Rule 56. Proviso Association of Retarded Citizens v. Village of Westchester, 914 F. Supp. 1555, 1560 (N.D. Ill. 1996); Chicago Truck Drivers, Helpers and Warehouse Workers Union (Ind.) Pension Fund v. Kelly, No. 95 C 501, 1996 U.S. Dist. LEXIS 12901, 1996 WL 507258, *3 (N.D. Ill. 1996). Thus, the traditional standards for summary judgment still apply even though both parties have moved for summary judgment. Blum v. Fisher and Fisher,

Attorneys at Law, 961 F. Supp. 1218, 1222 (N.D. Ill. 1997). The Court thus considers the merits of each cross-motion separately and draws all reasonable inferences and resolves all factual uncertainties against the party whose motion is under consideration. O'Regan v. Arbitration Forums, Inc., 246 F.2d 975, 983 (7th Cir. 2001); Chicago Truck Drivers, 1996 WL 507258 at *3. This "Janus-like perspective... sometimes forces the denial of both motions," but only where there are material facts in dispute. Buttitta v. City of Chicago, 803 F. Supp. 213, 217 (N.D. Ill. 1992), aff'd, 9 F.3d 1198 (7th Cir. 1993).

### III. Discussion

The first issue to be determined by this Court is the proper standard of review under ERISA applicable to CNA's decision to deny Billings long term disability benefits. The Supreme Court has held that "a denial of benefits challenged under § 1132(a)(1)(B) is to be reviewed under a *de novo* standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101, 115, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989). Where a plan confers power on the administrator (or fiduciary) to exercise discretion, the appropriate standard of review is the deferential "arbitrary and capricious" one. Id. at 111-12, 109 S.Ct. 948. If a plan does not specify the level or review or is ambiguous, review is to be plenary, or *de novo*. Herzberger v. Standard Ins. Co., 205 F.3d 327, 330-331 (7th Cir. 2000).

In this case, the Summary Plan Description states that CNA has "discretionary authority to determine" eligibility for benefits and to interpret the terms and provisions of the policy. The policy states that "Benefits will be paid monthly immediately after [CNA] receive[s] due written proof of loss." In Herzberger, the Seventh Circuit stated that discretion is not granted by stating

that benefits will be paid "only if the applicant submits satisfactory proof of his entitlement to them." 205 F.3d at 332. Such a statement conveys nothing more than that the insurance company "will not pay upon the insured's say- so; it will require proof." Herzberger, 205 F.3d at 332. In this case, the policy has a statement similar to the above statement discussed in Herzberger, while the Summary Plan Description grants the insurance company discretion. Thus, there is a conflict between the Summary Plan Description and the policy. When such a conflict exists, the terms of the policy control. See Health Cost Controls of Illinois, Inc. v. Washington, 187 F.3d 703, 711 (7th Cir. 1999) (explaining that the policy governs over the summary plan description because it is more complete). See also Wilczynski v. Kemper Nat'l Ins. Cos., 178 F.3d 933, 934 (7th Cir. 1999) (suggesting that it was erroneous for the district court to rely on the summary plan description, rather than the plan itself, to confer discretion); Vega v. Cherry Corporation Long Term Disability Plan, Continental Casualty Company, No. 01 C 6001, 2002 WL 31444481 at *1-2 (N.D. Ill. Oct. 31, 2002) (analyzing the same provisions of the CNA policy at issue in the case *sub judice* and finding that the summary plan description can not be used to expand discretion given under the policy). Thus, this Court will apply a *de novo* standard of review.

In applying the *de novo* standard of review, the issue is whether CNA was correct in finding that Billings was not disabled under the provisions of the policy. See Wilczynski, 178 F.3d at 934-35. The record establishes that Billings has continually met the Plan's three part definition of "Total Disability" and is thus entitled to long term benefits. She has been under the continuous care of several licensed physicians who have repeatedly stated and affirmed her inability to perform her occupation; and she has not been gainfully employed. Since May 2001

Billings' diagnosed conditions have produced debilitating pain which has failed to be remedied by a bevy of surgical procedures, use of several different prescription medicines, and physical therapy.[1] Billings suffers from progressive degenerative changes in her spine in the L2 through L5 vertebrae. The resulting spinal arthritis, spinal stenosis, lumbar radiculopathy, lumbar spasm and lumbar arthropathy has caused progressive pain in her low back, buttocks, hips and lower extremities down through her foot. This pain severely limits Billings' everyday functionality including the inability to work, due to her compromised ability to walk, stand or sit. Notably, CNA repeatedly found Billings' condition and resultant pain prevented her from performing her job and sedentary work in general.

Billings has received no appreciable long-lasting relief from this pain despite the use of several prescribed medications (Vicodin, Vioxx and Ultram), physical therapy and various surgical procedures, including several series of lumbar epidural steroid injections, a series of bilateral facet lumbar steroid injections, nerve blocks and radiofrequency denervation (or rhizotomy) of both facet joints at L2-3, L3-4 and L4-5. No less than three treating physicians (Drs. Amin, Rovner, and Djordjevic) and one examining physician (Dr. Cerullo) have verified plaintiff's disabling medical condition. Further, Drs. Rovner and Djordjevic explicitly reported Billings to be disabled directly to CNA.

CNA conditionally approved long term benefits upon receipt of an updated medical opinion from Dr. Djordjevic. On January 7, 2002 - one week before CNA issued its denial letter

---

[1]Throughout the defendant's response to plaintiff's statement of uncontested facts, it refutes that Billings was in pain and states that any reports of pain are unsupported by the administrative record. It is incredulous to assert that an individual would suffer through several lumbar epidural steroid injections and surgical procedures if that individual were not in considerable pain.

- Dr. Djordjevic verified Billings' continued inability to work at her job as described by CNA, i.e. "primarily seated in nature but does allow the flexibility to stand and change positions when needed." CNA then denied benefits based on Dr. Djordjevic's statement, in the same report, that Billings "cannot sit, stand, or walk for prolonged periods of time." To reach the conclusion that this statement supports a denial of benefits is to ignore the entire balance of Dr. Djordjevic's opinion and the medical evidence previously presented to CNA. The two statements are not in conflict. Dr. Djordjevic was merely explaining the limitations which supported his opinion that Billings could not perform her job. CNA provides no reasoning behind its argument that a person who is suffering from "ongoing low back pain and right thigh pain" and who "cannot sit, stand, or walk for prolonged periods of time" is capable of sedentary work. Further, CNA fails to explain why it is inconsistent for Dr. Djordjevic to cite such limitations in conjunction with his statement of disability which explicitly considered a job that allowed the flexibility to stand and change positions when needed. Thus, the contrary significance CNA reads into this statement is fundamentally flawed. The Claims Analysis Record indicates CNA attempted one phone call to Dr. Djordjevic seeking a "clarification" of his opinion. The record does not indicate that CNA did anything more. If CNA was genuinely confused by Dr. Djordjevic's opinion, it should have followed up with the doctor before denying benefits based on his opinion. Instead, it denied Billings benefits one week after Dr. Djordjevic's opinion was issued. CNA provides no reasonable explanation for why it reversed a previously approved claim based on a doctor's opinion which actually affirmed disability.

CNA also affirmed its denial based on a single phone conversation on August 9, 2001 between James Zito and Billings, in which Billings was reported to say her main impediment to

working was actually getting to and from work. During this conversation, Billings also reportedly stated she does not drive, has trouble walking and finds it difficult to leave home at all. CNA's reliance on this single conversation, which took place five months before its decision to terminate benefits, is grossly misplaced. CNA did not find that the conversation warranted a termination of benefits at the time it occurred. On August 20, 2001, plaintiff underwent a rhizotomy, which failed to relieve her pain. CNA then determined that a continuation of benefits was proper because Billings was unable to perform sedentary work. On September 20, 2001, Billings underwent radiofrequency denervation of the medial branches of the posterior primary rami with a number of facets, L2, L3, L4 and L5 bilaterally under fluoroscopy. The NCM contacted Billings by telephone on October 2, 2001. During that conversation, Billings stated that she was not doing very well and continued to have problems with pain. Billings reported that she found movement difficult and had particular problems walking. Again, Billings benefits were continued due to her inability to perform sedentary work, pending a surgical consultation. It is clear from the medical evidence presented to CNA that Billings' conditions create a drastically greater impediment to her functionality than mere limitation of daily ingress and egress to her job. Thus, it strains credulity for CNA to point to the August 9, 2001 conversation in support of its termination of benefits on January 14, 2002.

Billings has continuously and unequivocally met the definition of Total Disability since she began short term disability in May 2001. Her condition has not changed. The medical evidence that CNA repeatedly found to support Billings' incapacity to perform sedentary work

does not reveal any appreciable improvement in Billings' medical condition and pain.[2] There are no contrary opinions from any doctor. CNA did not consult with or obtain any other physician's opinion or seek an independent medical examination of Billings. Indeed, CNA never utilized a doctor at any level of the claims process, even to review the medical evidence submitted by four of Billings' treating physicians.

## Conclusion

For the foregoing reasons, Billings' motion for summary judgment is GRANTED. Billings is entitled to payment of disability benefits retroactive to January 7, 2002 with prejudgment interest at a rate of 9% pursuant to 215 ILCS 5/357.9. Further, Billings is entitled to the reinstatement of her long term disability benefits so long as she continues to meet the terms and conditions for continued receipt of such benefits. Accordingly, Continental Casualty Company's motion for summary judgment is DENIED.

Enter:

_____
David H. Coar
United States District Judge

Dated: January 15, 2003

---

[2] The medical evidence in this case is so overwhelming that had this Court applied an arbitrary and capricious standard it would have found CNA's determination to be downright unreasonable.